UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **RAYSHAWNDA GILMORE** and **TANEISHA MCCLYMONT**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. NURSING CORPORATION, d/b/a U.S. NURSING**, a Colorado corporation,<br><br>Defendant. | Case No.: 1:23-cv-03345<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs RAYSHAWNDA GILMORE ("Plaintiff Gilmore") and TANEISHA MCCLYMONT ("Plaintiff McClymont") ("Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned counsel, hereby bring this Class Action Complaint against Defendant U.S. NURSING CORPORATION, d/b/a U.S. NURSING, a Colorado corporation ("Defendant"), and state as follows:

**THE PARTIES**

1. Plaintiff Gilmore is a Connecticut resident who was temporarily employed by Defendant as a strike nurse from October 1 to October 6, 2023. (**Exhibit 1**, Plaintiff Gilmore's Strike Agreement Letter.)

2. Plaintiff McClymont is a Georgia resident who was temporarily employed by Defendant as a strike nurse from October 1 to October 6, 2023. (**Exhibit 2**, Plaintiff McClymont's Strike Agreement Letter.)

3. Defendant is a Colorado corporation and is the premier strike nurse agency provider of job action services in the United States.

1

## JURISDICTION

4. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one class member are citizens of different states.

5. This Court has personal jurisdiction over Defendant because Defendant is incorporated in Colorado, resides in Colorado, and maintains its principal place of business in Colorado.

## VENUE

6. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## GENERAL ALLEGATIONS

7. This is a Fed. R. Civ. P. 23 ("Rule 23") class action for late payments and waiting time penalties under the California Labor Code ("Labor Code").

8. Rule 23 permits a plaintiff to sue as a representative of a class if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

9. Defendant temporarily employed Plaintiffs from October 1 to October 6, 2023, as strike nurses at Kaiser Permanente South Bay Medical Center, 25825 Vermont Avenue, Harbor City, California 90710. (**Exhibits 1-2**, Plaintiffs' Strike Agreement Letters.)

2

10.     Plaintiffs and all other similarly situated strike nurses and healthcare professionals were temporarily employed by Defendant during the week of October 1, 2023, and were assigned by Defendant to work at a Kaiser Permanente facility in Southern California in connection with Kaiser Permanente's three-day strike from October 4 to October 6, 2023.

**Strike Nursing**

11.     As the healthcare crisis unfolds, the U.S. has faced some of the largest healthcare strikes in history. Since 2022, the Bureau of Labor Statistics has recorded 23 major work stoppages, idling 120,600 workers across industries. And even more noteworthy – 88% of these strikes involved the healthcare and education sectors. As healthcare strikes continue, a specialized field of nursing takes center stage: strike nursing.

12.     Strike nurses, much like travel nurses, take on short-term contracts at facilities. Strike nurses are distinct because they fill positions in facilities that are facing staffing shortages due to staff nurses going on strike.

13.     Strike nurses are like a defibrillator for the healthcare system. When staff workers – the heart of the company – stop working, strike nurses step in to resuscitate the facility's vital functioning until internal issues are resolved.

14.     Due to the chaotic nature of strike nursing, it is known for receiving higher compensation in the industry. However, working as a strike nurse is fraught with challenges. During strikes, hospital facilities face significant challenges, but unlike other businesses, they can't just shut down for a few days until the dispute is resolved. The healthcare system must keep its doors open and care for its patients – and that's where strike nurses come into play.

15.     A typical strike nurse assignment starts fast, so strike nurses must pack their bags quickly. Strike nurses are expected to kick off their assignment within days. A hiring agency

typically covers the cost of flights and accommodations.

16. The distinguishing feature of strike nursing is its sudden and short-term nature. It typically ends just as quickly as it started.

17. Strike nursing requires flexibility, adaptability, and resilience, but it also offers the opportunity to make a significant impact during a critical period for healthcare facilities, communities, and patients in need.

18. While the dynamics of each strike are unique, the issue escalated significantly during the COVID-19 pandemic, which took a toll on the healthcare system. While some people enjoyed remote work, healthcare workers fought for their patients on the frontlines.

19. Nurses faced immense stress due to their workloads in high-risk environments, leading to burnout and in some cases, work-related post-traumatic stress disorder (PTSD) – which in many states is not covered by workers' compensation.

20. Since the pandemic, the healthcare system has continued facing challenges. Some of the reasons triggering nurse strikes include staffing issues, unsafe work conditions, unfair wages, and concerns about patient care tied to work environment issues.

21. There's no clear end in sight for the issues that trigger nurse strikes, and finding quick solutions to this long-standing problem is challenging. As such, strike nurses are likely to be in high demand until the healthcare system implements more effective, long-term solutions.

22. The ethical aspects of working as a strike nurse are open to debate, with a range of varying opinions. The question of whether replacing staff nurses during strikes is acceptable depends on personal values.

23. The demand for strike nursing today is higher than ever due to ongoing labor disputes. Strike nurses are among the highest paid nurses in the industry, sometimes earning up to

$120.00 per hour. Additionally, some agencies offer bonuses, overtime pay, per diem for housing, and other incentives.

**75,000 Kaiser Permanente Nurses, Pharmacists and Other Workers Walk Off the Job**

24.  Healthcare workers at hundreds of Kaiser Permanente hospitals and medical facilities across the U.S. walked off the job on Wednesday morning, October 4, 2023, in an effort to ramp up pressure on their employer to fix staffing shortages that have intensified since the pandemic.

25.  Over 75,000 workers – including nurses, emergency department technicians, pharmacists, and hundreds of others – went on strike in California, Colorado, Washington, Oregon, Virginia, and Washington D.C.

26.  It was the biggest healthcare strike in U.S. history according to the unions.

27.  Kaiser Permanente, headquartered in Oakland, California, is one of the largest nonprofit healthcare providers in the U.S., serving nearly 13 million patients.

28.  Most Kaiser Permanente workers who walked off the job were on strike for three days, until Saturday morning, October 7, 2023 – except those in Virginia and Washington D.C., who were on strike for 24 hours.

**Plaintiffs' Strike Assignment**

29.  Plaintiffs arrived in Southern California for their strike assignment duties at Kaiser Permanente South Bay Medical Center on October 1, 2023, and spent the next three days attending mandatory induction, orientation, training, and onboarding. (*See* **Exhibits 1-2**, Strike Agreement Letters; **Exhibit 3**, Plaintiff Gilmore's Induction Passport.)

30.  Plaintiff Gilmore worked at least 76.10 hours for Defendant – including induction, orientation, training modules, onboarding, and three strike assignment shifts – in connection with

her strike assignment duties at Kaiser Permanente South Bay Medical Center. (*See* **Exhibit 4**, Plaintiff Gilmore's Electronic Timesheet; **Exhibit 5**, Plaintiff Gilmore's Earning Statements.)

31. Plaintiff McClymont worked at least 57.58 hours for Defendant – including induction, orientation, training modules, onboarding, and three strike assignment shifts – in connection with her strike assignment duties at Kaiser Permanente South Bay Medical Center. (*See* **Exhibit 6**, Plaintiff McClymont's Earning Statements.)

32. Defendant agreed to pay Plaintiffs $68.00 per hour for time worked during the in-person orientation and for their strike assignment shifts. (**Exhibits 1-2**, Strike Agreement Letters at 2; **Exhibits 7-8**, Plaintiffs' Labor Code Section 2810.5 Notice Letters ("Notice Letters") at 1.)

33. The strike assignment included "Daily Pay" – meaning that Defendant was obligated to pay Plaintiffs and the similarly situated healthcare professionals at the end of each workday. (**Exhibits 1-2**, Strike Agreement Letters at 2 ("As this strike includes Daily Pay, it is imperative that you submit your timesheet within 30 minutes of ending your shift."); **Exhibits 7-8**, Notice Letters at 1.)

34. Labor Code Section 2810.5 requires employers to furnish new employees with a written notice containing the following information: their rate of pay; the regular payday; meal, lodging, and other allowances claimed as part of the minimum wage; the employer's name, telephone number, and address; the workers' compensation insurance carrier's name, telephone number, and address; sick leave laws; whether there has been a federal or state emergency or disaster declaration in their county within the last 30 days; and any other information the Labor Commissioner requires. Cal. Lab. Code § 2810.5. Additionally, employers have seven days to notify employees of any changes to the above information. *Id*.

35. Defendant furnished Plaintiffs with Labor Code Section 2810.5 Notice Letters.

6

(**Exhibits 7-8**). The Notice Letters include, among other things, the legal name of the hiring employer (U S Nursing Corporation); the entity for whom the employee will perform work (Kaiser Permanente Northern California Regional Office); the rate of pay ($68.00); the overtime rate of pay ($102.00); and the regular payday (Daily). (*Id*.)

36. Hours for time spent at the onsite orientation and time worked during the strike were captured via a scanner by Defendant's onsite representatives.

37. Plaintiffs and the similarly situated healthcare professionals were instructed to download their personal QR codes to be used for scanning via the US Nursing App.

38. The QR codes were scanned at the beginning and end of the onsite orientation as well as at the assigned hospital facility for the beginning and end of the strike assignment shifts.

39. Plaintiffs were scheduled to work three 12-hour strike assignment shifts at Kaiser Permanente South Bay Medical Center.

40. Plaintiff Gilmore worked a 14-hour strike assignment shift on October 4, 2023; a 12-hour strike assignment shift on October 5, 2023; and a 12-hour strike assignment shift on October 6, 2023. (**Exhibit 4**, Plaintiff Gilmore's Electronic Timesheet.)

41. Plaintiff McClymont worked a 12-hour strike assignment shift on October 4, 2023; a 12-hour strike assignment shift on October 5, 2023; and a 12-hour strike assignment shift on October 6, 2023. (**Exhibit 6**, Plaintiff McClymont's Earning Statements.)

42. Plaintiff Gilmore's October 4 strike assignment shift began at 3:51 PM and ended on October 5 at 6:00 AM. (**Exhibit 4**, Plaintiff Gilmore's Electronic Timesheet.)

43. Plaintiff Gilmore's October 5 strike assignment shift began at 6:00 AM and ended at 6:00 PM, meaning that Plaintiff Gilmore worked more than 26 consecutive hours. (*Id*.)

44. Plaintiff Gilmore's October 6 strike assignment shift began at 5:47 AM and ended

7

at 5:53 PM. (*Id.*)

45. Due to technical issues associated with Defendant's electronic timekeeping technology, Plaintiffs' electronic timesheets understate the number of hours that Plaintiffs worked for Defendant.

46. Due to technical issues associated with Defendant's electronic timekeeping technology, Plaintiffs were not paid all wages owed at the end of each workday.

47. In fact, even though Plaintiffs' strike assignment ended on October 6, 2023, Plaintiffs have *still* not been paid for all their compensable work time.

48. The table below shows that Defendant has paid Plaintiff Gilmore $3,834.96 in net wages across ten paychecks and seven different pay dates, *with the last pay date on December 1, 2023*. (*See also* **Exhibit 5**, Plaintiff Gilmore's Earning Statements, showing that Defendant has paid Plaintiff Gilmore $5,372.09 in gross wages across ten paychecks and seven different pay dates, *with the last pay date on December 1, 2023*.)



49. Likewise, the table below shows that Defendant has paid Plaintiff McClymont

$3,615.57 in net wages across nine paychecks and eight different pay dates, *with the last pay date on October 27, 2023*. (*See also* **Exhibit 6**, Plaintiff McClymont's Earning Statements, showing that Defendant has paid Plaintiff McClymont $4,263.00 in gross wages across nine paychecks and eight different pay dates, *with the last pay date on October 27, 2023*.)



50. Plaintiffs have persistently and repeatedly contacted Defendant's payroll department by phone and email regarding their unpaid work, but Defendant has willfully failed or refused to rectify the situation.

**Prompt Payment Under California Law**

51. "California has long regarded the timely payment of employee wage claims as indispensable to the public welfare." *Smith v. Superior Ct.*, 39 Cal. 4th 77, 82, 137 P.3d 218, 221 (2006).

52. The California Supreme Court has explained that this public policy is necessary because "[d]elay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public." *Id*., 39 Cal. 4th 77, 82, 137 P.3d 218, 220-21 (citation and quotations

9

omitted).

53. In furtherance of this important public policy, "[w]hen an employment relationship comes to an end, the Labor Code requires employers to promptly pay any unpaid wages to the departing employee. The law establishes different payment deadlines depending on the manner of departure." *Naranjo v. Spectrum Sec. Servs., Inc.*, 13 Cal. 5th 93, 105, 509 P.3d 956, 960 (2022).

54. Labor Code Section 201 establishes a baseline statutory deadline for paying employees who are discharged from their employment.

55. The statute provides that, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201(a).

56. Labor Code Section 202 specifies the default deadline for paying employees who instead resign and are not discharged.

57. In contrast to employees who are discharged and whose wages are "due and payable immediately," *id*. § 201(a), the wages of an employee who "quits his or her employment ... shall become due and payable not later than 72 hours thereafter," *id.* § 202(a).

58. Labor Code Section 201.3 states that, "[i]f an employee of a temporary services employer is assigned to work for a client and is discharged by the temporary services employer or leasing employer, wages are due and payable as provided in Section 201." *Id*. § 201.3(b)(4).

59. Labor Code Section 201.3 states that, "[i]f an employee of a temporary services employer is assigned to work for a client and quits his or her employment with the temporary services employer, wages are due and payable as provided in Section 202." *Id*. § 201.3(b)(5).

60. "If an employer willfully fails to pay ... any wages of an employee who is discharged or who quits," the employee is entitled to waiting time penalties. *Id*. § 203(a).

61. "Waiting-time penalties are calculated by multiplying the daily wage rate by the number of days of nonpayment up to 30 days." *Jones v. Tween Brands, Inc.*, No. 2:14-CV-1631-ODW, 2014 WL 1607636, at *3 (C.D. Cal. Apr. 22, 2014) (citation omitted).

62. Notably, "a 'discharge' requires the end of an *employment relationship*." *Young v. RemX Specialty Staffing*, 91 Cal. App. 5th 427, 433, 308 Cal. Rptr. 3d 320, 324 (2023) (emphasis in original).

63. Defendant's Employee Handbook (**Exhibit 9**), which was distributed to Plaintiffs and the similarly situated healthcare professionals in connection with the Kaiser Permanente strike assignment, discusses the duration of the employment relationship. The Employee Handbook explains, in pertinent part:

> The Company employs healthcare professionals *solely for the duration of an assignment to a client facility*. Thus, you will be employed by the Company *from the beginning of an assignment to the end of the assignment*, …. After an assignment ends, *your employment with the Company will be considered completed*.

(*Id*. at p. 7 (emphasis added).)

64. Per the Employee Handbook, Defendant employed Plaintiffs and the similarly situated healthcare professionals *solely for the duration of their assignment to Kaiser Permanente*. (*Id*.)

65. Per the Employee Handbook, Plaintiffs and the similarly situated healthcare professionals were employed by Defendant *from the beginning of their assignment to Kaiser Permanente to the end of their assignment to Kaiser Permanente*. (*Id*.)

66. Per the Employee Handbook, after Plaintiffs' and the similarly situated healthcare professionals' assignments to Kaiser Permanente ended, *their employment with Defendant was complete*. (*Id*.)

67. Per the Strike Agreement Letters (**Exhibits 1-2**), Plaintiffs' and the similarly

11

situated healthcare professionals' assignments to Kaiser Permanente ended on October 6, 2023.

68. Hence, Plaintiffs' and the similarly situated healthcare professionals' employment relationships with Defendant ended – i.e., they were "discharged" – on October 6, 2023, and therefore, the wages earned and unpaid at the time of "discharge" were due and payable immediately. Cal. Lab. Code § 201(a).

69. It is undisputed that Defendant did not pay Plaintiffs "the wages earned and unpaid" at the time of their October 6, 2023, discharge. (**Exhibits 5-6**, Plaintiffs' Earning Statements.)

70. Plaintiff Gilmore worked at least 76.10 hours for Defendant from October 1 to October 6, 2023, but Defendant only paid Plaintiff Gilmore for 41 hours at the time of her October 6 discharge. (**Exhibit 5**, Plaintiff Gilmore's Earning Statements.)

71. Defendant has paid Plaintiff Gilmore $2,026.09 in late wages across seven different paychecks and four different pay dates, *with the last pay date on December 1, 2023*. (*Id.*)

72. On October 7, 2023 – one day after Plaintiff Gilmore's October 6 discharge – Defendant issued two checks to Plaintiff Gilmore totaling $236.64. (*Id.*)

73. On October 13, 2023 – seven days after Plaintiff Gilmore's October 6 discharge – Defendant paid Plaintiff Gilmore $504.09. (*Id.*)

74. On October 27, 2023 – 21 days after Plaintiff Gilmore's October 6 discharge – Defendant issued three checks to Plaintiff Gilmore totaling $419.04. (*Id.*)

75. On December 1, 2023 – 56 days after Plaintiff Gilmore's October 6 discharge – Defendant paid Plaintiff Gilmore $866.32. (*Id.*)

76. Plaintiff McClymont worked at least 57.58 hours for Defendant from October 1 to October 6, 2023, but Defendant only paid Plaintiff McClymont for 41 hours at the time of her October 6 discharge. (**Exhibit 6**, Plaintiff McClymont's Earning Statements.)

77. Defendant has paid Plaintiff McClymont $957.00 in late wages across six different paychecks and five different pay dates, *with the last pay date on October 27, 2023*. (*Id*.)

78. On October 7, 2023 – one day after Plaintiff McClymont's October 6 discharge – Defendant paid Plaintiff McClymont $40.00. (*Id*.)

79. On October 9, 2023 – three days after Plaintiff McClymont's October 6 discharge – Defendant paid Plaintiff McClymont $248.22. (*Id*.)

80. On October 13, 2023 – seven days after Plaintiff McClymont's October 6 discharge – Defendant paid Plaintiff McClymont $200.78. (*Id*.)

81. On October 20, 2023 – 14 days after Plaintiff McClymont's October 6 discharge – Defendant paid Plaintiff McClymont $39.44. (*Id*.)

82. On October 27, 2023 – 21 days after Plaintiff McClymont's October 6 discharge – Defendant issued two checks to Plaintiff McClymont totaling $428.56. (*Id*.)

83. All of these payments constitute wages, and all of these wages were earned and unpaid at the time of Plaintiffs' October 6 discharge and were due and payable *immediately* on October 6, 2023. Cal. Lab. Code § 201(a).

84. Although Plaintiffs agree that natural disasters or similar events wholly beyond the employer's control may in proper circumstances allow an employer to make late payments without violating the Labor Code, this case does not present such exceptional circumstances.

85. The late payment or nonpayment of wages in the instant case is solely due to administrative incompetence, indifference, or inertia.

86. Defendant willfully failed to pay Plaintiffs and the similarly situated healthcare professionals "the wages earned and unpaid" at the time of their October 6, 2023, discharge, and therefore, Plaintiffs and the similarly situated healthcare professionals are entitled to waiting time

penalties under Labor Code Section 203(a).

<b><u>RULE 23 CLASS ACTION ALLEGATIONS</u></b>

87. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf and on behalf of:

> **All strike nurses and other healthcare professionals who were temporarily employed by Defendant during the week of October 1, 2023, and who were assigned by Defendant to work at a Kaiser Permanente facility in Southern California in connection with Kaiser Permanente's three-day strike from October 4 to October 6, 2023, and who were not timely paid all wages owed at the end of their employment relationship.**

(hereinafter referred to as the "Rule 23 Class").

88. The Rule 23 Class is so numerous that joining all Rule 23 Class members in this case would be impractical. Plaintiffs reasonably estimate there are hundreds if not thousands of Rule 23 Class members. The Rule 23 Class should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

89. There is a well-defined community of interest among the Rule 23 Class, and common questions of law and fact predominate in this action over any questions affecting individual Rule 23 Class members. These common legal and factual questions include, but are not limited to:

   a. Whether Defendant timely paid all wages owed to the Rule 23 Class members at the end of their employment relationships with Defendant; and

   b. Whether the Rule 23 Class members are owed waiting time penalties in connection with Defendant's failure to timely pay all wages owed to the Rule 23 Class members at the end of their employment relationships with Defendant.

90. Plaintiffs' claims are typical of the Rule 23 Class members' claims because Plaintiffs and the Rule 23 Class suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Class members' claims,

14

and Plaintiffs' legal theories are based on the same legal theories as all other Rule 23 Class members.

91. Plaintiffs will fully and adequately protect the Rule 23 Class members' interests and have retained counsel who is qualified and experienced in the prosecution of wage-and-hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the Rule 23 Class members' interests.

92. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the country.

93. This case will be manageable as a class action. Plaintiffs and their counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

94. Because the elements of Fed. R. Civ. P. 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

### COUNT I
### VIOLATION OF CAL. LAB. CODE §§ 201, 201.3, 202, 203
### FAILURE TO TIMELY PAY WAGES UPON TERMINATION
### (On Behalf of the Rule 23 Class)

95. Plaintiffs re-allege and incorporate all previous paragraphs herein.

96. Defendant willfully violated Cal. Lab. Code §§ 201, 201.3, 202, and 203 by failing to timely pay all wages owed to Plaintiffs and the Rule 23 Class at the end of their employment relationships with Defendant.

97. Plaintiffs and the Rule 23 Class are entitled to waiting time penalties under Labor Code Section 203(a).

98. Labor Code Section 218.5 states, in pertinent part: "In any action brought for the nonpayment of wages … the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request judgment as follows:

a. Certifying this case as a class action under Fed. R. Civ. P. 23(b)(3);

b. Designating Plaintiffs as the representatives of the Rule 23 Class and undersigned counsel as class counsel for the same;

c. Finding that Defendant willfully violated Cal. Lab. Code §§ 201, 201.3, 202, and 203 by failing to timely pay all wages owed to Plaintiffs and the Rule 23 Class at the end of their employment relationships with Defendant;

d. Waiting time penalties under Cal. Lab. Code § 203(a) in an amount equal to 30 times Plaintiffs' and the Rule 23 Class's daily wage rates;

e. Reasonable attorneys' fees and costs under Cal. Lab. Code § 218.5;

f. Pre- and post-judgment interest; and

g. Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, by their undersigned counsel, hereby demand a jury trial under Fed. R. Civ. P. 38.

Dated: December 20, 2023                    */s/ Rod M. Johnston*
                                             Rod M. Johnston
                                             **JOHNSTON LAW, PLLC**
                                             6911 Duchess Court
                                             Troy, Michigan 48098
                                             (586) 321-8466
                                             rod@johnstonlawflsa.com

                                             *Attorney for Plaintiffs and the*
                                             *Proposed Rule 23 Class Members*

17